## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VILLAGE HEIGHTS CONDOMINIUM ASSOCIATION, an unincorporated association, | : : : | 4:16-cv-554 |
| | : | |
| Plaintiff, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| THE CINCINNATI INSURANCE CO., | : | |
| | : | |
| Defendant. | : | |

### MEMORANDUM

### February 10, 2017

Presently before the Court are Cross-Motions for Summary Judgment filed by the Plaintiff, Village Heights Condominium Association (doc. 15), and the Defendant, the Cincinnati Insurance Company (doc. 12). The Motions have been fully briefed (docs. 14, 17, 20, 21 and 23) and are thus ripe for our review. For the reasons that follow, the Court will deny the Defendant's Motion in full and grant the Plaintiff's Motion.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

At all times relevant to the above-captioned action, the Plaintiff Village Heights Condominium Association ("Plaintiff") was the insured entity on a policy (the "Policy") issued by the Defendant, Cincinnati Insurance Company ("Defendant"). (Doc. 16, ¶ 20; doc. 22, ¶ 20). The Village Heights development is

a gated community comprised of fifty (50) units, including fifteen (15) stand-alone homes, one (1) duplex, one (1) triplex, and thirty (30) apartment units. (Doc. 1-2, ¶ 7; doc. 14, p. 6).[1]  Plaintiff is an association of unit owners that acts through an executive board. (Doc. 14, p. 5).  Plaintiff is generally responsible for maintaining all common areas in the development, including all external grounds, roofs, building standard components, walls, ceilings and floors, stopping at the interior surface of the same, at which point the unit begins. (Doc. 1-2, ¶ 8; doc. 16, ¶ 10).

In or around December 2013, Mr. and Mrs. Herb Graves owned and resided in Unit 205, a stand-alone villa within the Village Heights development ("Unit 205" or "the Unit"). (Doc. 1-2, ¶¶ 11-12).  The same month, Mr. and Mrs. Graves elected to move from Unit 205 into an apartment unit and so entered into an agreement to sell Unit 205 to a third party. (Id.).  Throughout the winter of 2013-14, Mr. and Mrs. Graves maintained the heat in Unit 205, and Mr. Graves inspected the interior of the Unit every Friday to ensure that its systems and maintenance were functioning properly. (Id., ¶ 13).  However, the parties agree that the Unit was predominantly empty, "most" of the furniture having been sold at an auction held in late 2013. (Doc. 16, ¶ 38; doc. 22, ¶ 38).  Mr. and Mrs. Graves did continue to store several trunks and a few items of furniture in the garage of the

---

[1]     The parties dispute whether the units in Village Heights Condominiums are rental units or available for purchase. (Doc. 16, ¶ 5; doc. 22, ¶ 5).

Unit. (Doc. 16, ¶ 39; doc. 22, ¶ 39).[2]  They also kept some wine in the wine cellar, which Mr. Graves occasionally retrieved as needed. (Doc. 16, ¶¶ 39-40; doc. 22, ¶¶ 39-40).[3]  The parties dispute whether the Graves' intermittently kept a car at the Unit. (Doc. 16, ¶ 36; doc. 22, ¶ 36).

In the summer of 2014, the pending sale of the Unit fell through. (Doc. 1-2, ¶ 14). Mr. and Mrs. Graves continued to seek another buyer through the winter of 2014-15, and the Unit was shown on a regular basis. (*Id.*, ¶ 14-16). Mr. Graves continued to check the Unit every Friday (*id.*, ¶ 15); however the Complaint is silent regarding whether Mr. and Mrs. Graves continued to keep the heat on in the Unit throughout this time. (*See generally, id.*).[4]

On or about March 1, 2015, while Mr. and Mrs. Graves were on vacation,[5] a pipe froze in the Unit, causing the pipe to burst and resulting in significant water damage. (*Id.*, ¶ 18). When they returned from vacation, the Graves' observed "ice hanging out" of the Unit. (Doc. 16, ¶ 46; doc. 22, ¶ 46).

---

[2]    The garage apparently accounts for 568 square feet of the Unit's total square footage, which is 4,783 square feet. Thus, the total space of the garage amounts to 12% of the Unit's total square footage. (Doc. 14, p. 10).

[3]    The parties dispute the exact amount of wine, with Plaintiff characterizing the wine cellar as "fully stocked" and Defendant noting the language of Mr. Graves' deposition which indicated that the wine cellar "still had wine in it." (Doc. 22, ¶ 39).

[4]    In Plaintiff's Brief in Support of Summary Judgment, Plaintiff clarifies that, on or about March 1, 2015, "the furnace that heated the condominium unit owned by Mr. and Mrs. Herbert Graves, Unit 205, stopped working . . . ." (Doc. 17, p. 4).

[5]    Mr. and Mrs. Graves were gone from February 22, 2015, through March 1, 2015. (Doc. 16, ¶ 45).

The parties agree that Unit 205 is identified as "Location 11" on the Schedule of Locations attached to the Commercial Property Coverage Part Declarations (the "Declarations") forming a portion of the Policy. (Doc. 16, ¶ 27; doc. 22, ¶ 27). Defendant states that the policy "provides coverage for the 19 separate buildings on Village Heights Drive, each of which are separately listed in the Policy's Declarations." (Doc. 14, pp. 7-8). Plaintiff argues that Defendant's characterization misconstrues the nature of the coverage, and that the buildings are not in fact listed separately in the Declarations but are instead described as a single "Blanket Building." (Doc. 20, p. 5).

After the water damage occurred, Plaintiff filed a claim with Defendant, believing some of the damage caused to be covered under the Policy referenced above. (Doc 1-2, ¶ 19). Specifically, Plaintiff anticipated that the common elements of the Unit, including the drywall of the ceilings and walls and the internal mechanical, electrical and HVAC components, would be insured under the Policy. (Doc. 16, ¶ 64).

On June 1, 2015, Defendant issued a declination of coverage letter to Plaintiff. (Doc. 1-2, ¶ 20). Defendant cited the "Vacancy Provision" of the Policy ("Vacancy Provision") as the reason for refusing to cover the damage caused by the burst pipe. (Id.; doc. 22, ¶ 48). The Vacancy Provision is reproduced as follows:

**SECTION D. LOSS CONDITIONS**

The following conditions apply in addition to the COMMON POLICY
CONDITIONS and the COMMERCIAL PROPERTY CONDITIONS.

**6. <u>Vacancy</u>**
**a. <u>Description of Terms</u>**
    **(1)** As used in this Vacancy Condition, the term building and the term
vacant will have the meanings set forth in (1)(a) and (1)(b) below:

        **(a)**   When this Coverage Part is issued to a tenant, and with
respect to that tenant's interest in Covered Property,
building means the unit or suite rented or leased to the
tenant.  Such building is vacant when it does not contain
enough business personal property to conduct customary
operations.

        **(b)**   When this Coverage Part is issued to the owner or
general lessee of a building, building means the entire
building.  Such building is vacant unless at least 31% of
its total square footage is:

            **1)**   Rented to a lessee or sublessee and used by them
to conduct their customary operations; or
            **2)**   Used by the building owner to conduct customary
operations.

**b. <u>Vacancy Provisions</u>**
If the building where "loss" occurs has been vacant for more than 60
consecutive days before that "loss", we will:

    **(1)** Not pay for any "loss" caused by any of the following, even if they
are Covered Causes of Loss:

        **(a)**   Vandalism;
        **(b)**   Sprinkler leakage, unless you have protected the system
against freezing;
        **(c)**   Building glass breakage;
        **(d)**   Water damage;
        **(e)**   Theft; or
        **(f)**   Attempted theft.

    **(2)** Reduce the amount we would otherwise pay for the "loss" by 15%
with respect to Covered Causes of Loss other than those listed in
b.(1)(a) through b.(1)(f) of this Loss Condition.

(Doc. 14, p. 8).

The denial of coverage formed the basis for the law suit filed by Plaintiff and against Defendant on June 10, 2015 in the Court of Common Pleas of Centre County, Pennsylvania.  In its Complaint, Plaintiff requests a declaratory judgment in its favor and against Defendant, confirming that coverage for this incident exists under the Policy. (Doc. 1-2., ¶ 20).  Plaintiff also requests such other relief as may be deemed appropriate, including attorney's fees and costs. (*Id.*).  Defendant moved for judgment on the pleadings on October 8, 2015; the Motion was denied. (Doc. 14, p. 5).

On March 8, 2016, Defendant first ascertained that no member of Plaintiff, an association, resided in the state of Ohio. (Doc. 1, ¶ 13).  Accordingly, on March 31, 2016, Defendant filed a Notice of Removal to the District Court for the Middle District of Pennsylvania, citing diversity jurisdiction between Plaintiff and Defendant, an Ohio corporation. (Doc. 1-2, ¶ 2; doc. 1, ¶ 5).  Defendant indicates that the amount in controversy in the instant action exceeds the sum or value of $75,000, exclusive of interests and costs. (Doc. 1, ¶ 20).  Accordingly, we exercise diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

The parties completed discovery on August 30, 2016. (Doc. 14, p. 5).  On September 29, 2016, Defendant filed a Motion for Summary Judgment. (Doc. 12). A Motion for Summary Judgment filed by Plaintiff followed on October 3, 2016.

(Doc. 15). As noted above, both Motions have been fully briefed and, accordingly, are ripe for the Court's review.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial. *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In advancing their positions, the parties must support their

factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. Civ. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

## III. ANALYSIS

The parties agree that Pennsylvania contract law governs the above-captioned action. In Pennsylvania, interpretation of an insurance policy presents an issue of law for the courts to decide. *See Swarner v. Mut. Benefit Grp.*, 72 A.3d 641, 644 (Pa. Super. Ct. 2013) ("The proper construction of an insurance policy is resolved as a matter of law to be decided by the court in a declaratory judgment action") (internal citations and quotations omitted).

Case 4:16-cv-00554-JEJ   Document 25   Filed 02/10/17   Page 9 of 26

"Insurance policies are contracts . . . . In interpreting a contract, the court must ascertain the intent of the parties. Such intent is to be inferred from the written provisions of the contract." *Id.* (citing *State Farm Fire & Cas. Co. v. DeCoster*, 67 A.3d 40, 45 (Pa. Super. Ct. 2013). Where it exists, "'[c]lear policy language . . . is to be given effect, and courts should not torture the language to create ambiguities but should read the policy provisions to avoid [them].'" *USX Corp. v. Liberty Mut. Ins. Co.*, 444 F.3d 192, 198 (3d Cir. 2006) (citing *Selko v. Home Ins. Co.*, 139 F.3d 146, 152 n.3 (3d Cir. 1998)). However, where they are found to exist "in Pennsylvania, a court construes ambiguities in an insurance policy strictly against the insurer." *Id.* (internal citations omitted).

As noted above, the parties in the instant action have filed cross-Motions for Summary Judgment. After a carefully scrutinizing the parties' submissions, it appears that the dispute centers on two main arguments: (1) whether the Unit alone or the nineteen condominiums collectively constitutes the "building where the loss occurred"; and (2) whether the Unit was in fact vacant within the meaning of the Policy. We first consider the parties' arguments regarding whether the Policy was intended to insure the separate buildings, apart and distinct from each other, or whether the Policy meant to cover the nineteen buildings as one, making up a single "blanket building."

A.     **Interpretation of "Building"**

The parties disagree over the interpretation of "building" as stated in 6.a(1)(b) of the Policy's Vacancy Condition. This dispute is at the crux of the above-captioned action because only by ascertaining the bounds of what the Policy defines as a building may we determine the meaning of the 31% occupancy requirement described in the contractual language above. As explained, the parties disagree over whether "building" in the Vacancy Provision refers to each individual structure in the development or the development as a whole.

As noted, the Policy defines a building as vacant when the insurance the Policy provides is issued to the owner or general lessee of a building,[6] "unless at least 31% of its square footage" is rented or used. Of note is the requirement of ownership. The parties agree that Plaintiff is the "owner" of all the common areas in the development.[7] Given their agreement, we do not consider the requirements of ownership here.

---

[6]     The parties appear to agree that Section D, Subpart 6.a(1)(b) pertaining to an owner or general lessee of a building is applicable here.

[7]     Plaintiff states: "[i]n this case the insured, the Village Heights Condominium Association, was in the business of maintaining the overall common elements of the condominium. As such, the association is the "owner". The association is made up of all the unit owners of the condominium, each of whom by definition owns a percentage interest in the common elements." (Doc. 17, p. 15).

Similarly, Defendant states: "[h]ere, the term "building owner" can reasonably be interpreted to refer to the Association, as the owner of all common elements forming a part of the Subject Property, or the Unit Owners, as the record owners of the condominium unit located at the Subject Property. Regardless, the Subject Property would be considered vacant under either interpretation." (Doc. 14, p. 16). In its Brief in Opposition to Defendant's Motion for Summary Judgment, Plaintiff inexplicably states that Defendant urges the Court to consider Mr. and Mrs.

Plaintiff argues that because the Policy "treats the common elements of the Plaintiff's condominium as one building . . . even though a unit owner may move out of his particular unit, no vacancy occurs." (Doc. 20, p. 8). Rather, the Graves' absence from Unit 205 "is only one vacancy out of the 50 units that make up the . . . "Blanket Building", meaning that well more than 31% of the building remains occupied." (*Id.*). Unsurprisingly, Defendant disagrees with this characterization of the Policy's language. Rather, it asserts that the Policy covers nineteen separate buildings and the "building where the loss occurred" as well as the "entire building" described in the Vacancy Provision is meant to pinpoint the specific structure that was damaged. (Doc. 14, pp. 14-15).

We begin, as we must in order to infer the intent of the parties, with the plain language of the Policy. *See Meyer v. Cuna Mut. Grp.*, Civ. Action No. 03-602, 2007 WL 2907276, at *6 (W.D.Pa. Sept. 28, 2007) ("The goal of interpreting an insurance policy, like the goal of interpreting any other contract, is to determine the intent of the parties. It begins where it must – the language of the policy") (internal citations and quotations omitted).

The Policy provides that Covered Property

means the following types of property for which a Limit of Insurance is shown in the Declarations:

---

Graves to be the owners of Unit 205. (Doc. 17, p. 17). We can only presume that Plaintiff's counsel did not engage in a close read of Defendant's submission, as this is clearly a mischaracterization of Defendant's position.

a.   Building
Building means the building or structure described in the
Declarations . . . .

(Doc. 16-6, p. 3).  We turn to the Declarations, then, in reference to the

"Commercial Property Coverage Part Declarations."  (Doc. 16-5).  The table found

there is reproduced in relevant portion below:

| Loc. | (address) |
|------|-----------|
|      | PER STATEMENT OF VALUES ON FILE REFER TO IA904 |

**COVERAGE PROVIDED**

| Item | Coverage | Limits |
|------|----------|--------|
|      | BLANKET BUILDING | 15, 282, 755 |
|      | BLANKET BUSINESS PERSONAL PROPERTY | 265,000 |
| 1    | BUSINESS INCOME W/ EXTRA EXPENSE | 12 MONTHS ALS |
| 2    | BUSINESS INCOME W/ EXTRA EXPENSE | 12 MONTHS ALS |
|      | . . . |  |
| 19   | BUSINESS INCOME W/ EXTRA EXPENSE . | 12 MONTHS ALS |

(Doc. 16-5, p. 1) (highlighting added).[8]

---

[8]   The document is reproduced in full and appended to this Memorandum.

Plaintiff draws our attention to the phrase "Blanket Building" under "Coverage" (highlighted above).  In its brief in opposition to Defendant's Motion for Summary Judgment, Plaintiff argues that this terminology in the Declarations "indicates that the policy is for a "Blanket Building".  The declaration page thereafter refers to 19 separate locations that apparently comprise the "Blanket Building."  (Doc. 17, p. 13).  At the top of the page, the Declarations indeed reference a "Statement of Values" containing addresses and locations, and directing the reader to "refer to IA904."

The fifth page of the Declarations contains a "Schedule of Locations" with a subscript of IA 904 04 04 located at the bottom of the page.  (Doc. 16-5, p. 5).  Therein, nineteen (19) locations are numbered and addresses are provided in table format.  No further information is provided concerning the addresses.  As noted in the Factual Background, the parties agree that Location 11 on the Schedule, 205 Village Heights Drive, State College, PA  16801-7688, corresponds to Unit 205 owned by the Graves.

In summary, a large portion of the confusion in this matter arises because of the multiple different phrases the Policy uses to reference the structure(s) it purports to insure.  These include "Covered Property" in the first section of the policy, which is defined as "types of property for which a Limit of Insurance is shown in the Declarations" and includes "building, mean[ing] the building or

structure defined in the Declarations." (Doc. 16-6, p. 3).  However, Defendant admits that no definition whatsoever is provided in the Declarations;[9] rather two obscure phrases "Loc. (address) PER STATEMENT OF VALUES ON FILE REFER TO IA904" and "COVERAGE PROVIDED, Coverage, Blanket Building" with a coverage limit of $15,282,755.00, appear there.  As noted, on a later page a Schedule of Locations labeled IA 904 04 04 then lists individual addresses.

Finally, the Vacancy Provision, which appears in Section Six (6) of the Policy, appears to contain its own separate definitions of the term "building,"[10] which differ according to whether the Covered Property is owned by an owner or general lessee, or is leased to a tenant and is with respect to that tenant's interest in the property. (Doc. 16-6, pp. 29-30).  Where, as here, the Policy is issued to an owner, the Vacancy Provision defines "building" as "entire building." (*Id.*, ¶ 6.a(1)(b)).  In a subsequent paragraph, the Vacancy Provision then refers to "the building where "loss" occurs" to further specify its terms, including a requirement that the building be vacant for sixty (60) days. (*Id.*, ¶ 6.b).

Neither party specifically cites to case law that addresses purported "blanket building" insurance coverage or interprets such a term.  Defendant does specify that "the purpose of a blanket limit of insurance is to aggregate all insured

---

[9]    "Simply put, the Policy's Declarations do not define any terms, they merely identify the coverages available under the Policy.  Thus, the Declarations do not define a "Blanket Building," but rather indicate that the Policy provides Blanket Building Coverage. . . ." (Doc. 21, p. 8).
[10]    "As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below . . . ." (Doc. 16-6, p. 29).

locations under a single limit of insurance, which is available in the event of a loss to any one location." (Doc. 21, p. 8 (citing 44 C.J.S. Insurance § 21 (2008)).

Plaintiff indicates that Defendant relied on *JJD Associates of Palm Beach, Ltd. v. American Empire Surplus Lines Ins. Co.*, No. 11-80247-CV, 2011 WL 5873061 (S.D. Fla. Nov. 22, 2011) in its Motion for Judgment on the Pleadings before the state court. The facts of that case are analogous to those presented here. *JJD Associates* involved a shopping center with seven "sub-properties," some of which were connected and some of which were free-standing. *JJD Assc.*, 2011 WL 5873061, at *1-2. As here, the parties "disagree[d] over whether building in the vacancy provision refer[red] to each premises individually or the shopping center as a whole." *Id.* As here, the vacancy provision stated that "building means the entire building." *Id.* at *2.

The District Court for the Southern District of Florida opined that the insurance policy's definition of "building" was far from a model of clarity. Given the similarities between that policy and the one before us now, we can only agree. The Vacancy Provision's definition of building as "entire building" is not a useful clarification in the slightest. It may even conflict with the later specification of "building where the loss occurred" which appears in the following paragraph. The use of the word "entire" to define building could similarly be read to favor Plaintiff's all-encompassing interpretation of the Policy.

Furthermore, while we initially considered Plaintiff's interpretation of the Policy language to be somewhat contrived, upon further review, Plaintiff's position has logic. Plaintiff is responsible for "all common areas" in the development, and the language in the Policy provides coverage for a "blanket building" with a single limit to the Policy for all the common areas of the locations of approximately $15.3 million dollars. This language bolsters a construction that Defendant meant for all of the locations to be construed as one building. Certainly, each separate structure did not receive its own insurance valuation, nor were the structures listed separately before the Policy indicated that they would have blanket coverage. Rather, to ascertain the "loc."[11] and "address", in the singular, the parties merely referred to a "STATEMENT OF VALUES," giving no further indication of the intended meaning of "building."

In *JJD Associates*, the district court in Florida opined that the vacancy provision and its definition of "building" was "unclear;" thus, we infer that the court likely found the language ambiguous. However, the holding in *JJD Associates* ultimately turned on the policy's supplemental declarations. Each separate location within the shopping center was assigned its own page within the declarations, with a separate address and a description of the number of units, or store-fronts, housed within each structure. The location in question was

---

[11]     The Court reproduces the abbreviation used in the document itself in order to highlight that no further clarity could be gleaned from it.

specifically described as a restaurant on its separate page. This isolation and the independent descriptions caused the court to conclude that the insurer meant to construe each location separately, and as such, the term "building" as used throughout the policy "refers to each premises individually." *JJD Assc.*, 2011 WL 5873061 at *2.

Here, Defendant's supplement to the Declarations is not nearly so clear. The only supplement available is the Schedule of Locations adjacent to the Declarations. This is merely a single table spanning two pages and listing nineteen (19) "loc." and their street addresses, some of which contain only one street number and some of which list a range of street numbers.[12] No further description of the properties is provided whatsoever. The Schedule does not specify whether each location is a stand-alone residence, apartment complex, duplex, triplex, or an administrative building, clubhouse or gatehouse. Given that the structures at issue varied widely in size and purpose, they could easily have been listed separately or with some form of description.

Under Pennsylvania law,

> [w]here the language of the insurance contract . . . is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. 'Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being

---

[12] The two locations with ranges include "Loc. 16, 361-363 Village Heights Dr." and "Loc. 19, 352-356 Village Heights Dr." (Doc. 16-6, p. 6). Presumably these refer to the duplex and triplex respectively, but the Court has no way of ascertaining this information with certainty as the Schedule of Locations contains no description of each location.

understood in more than one sense.' Courts should not, however, distort the meaning of the language or strain to find an ambiguity.

*Meyer v. CUNA Mut. Grp.*, 2007 WL 2907276 at *7 (W.D.Pa. Sept. 28, 2007) (internal citations and quotations omitted). Here, we certainly agree with Defendant that its interpretation of "entire building" to mean the entirety of each separate stand-alone structure is a reasonable reading of the Policy. Defendant's interpretation may even be the more reasonable of the two readings. However, our place is not to choose which reading is the more reasonable, but simply to decide whether two reasonable readings exist.[13]

In the instant case, we find that Plaintiff's reading of the Policy to encompass all of the common areas into one "entire building" insured under a single policy limit, is also reasonable. The policy's use of the term "Blanket Building" to describe the coverage provided and its failure to differentiate between the structures anywhere in the policy except for a "Schedule of Locations" which amounts to no more than a list of addresses supports this reading. Defendant could have easily provided a separate schedule and description of each structure, as

---

[13]   "Although this court agrees with defendant that its interpretation of "total disability" is more reasonable than that of plaintiff, the court may not pick the most reasonable interpretation. Rather, in the insurance context, if there are two reasonable interpretations the court must choose not the best interpretation, but the interpretation favoring the insured. In order to find an ambiguity there simply needs to be one or more reasonable interpretations like the situation here. Since there are two reasonable interpretations, the court concludes that the policy clause in question is ambiguous. Under those circumstances, this court must construe the clause in favor of the insured, the plaintiff." *Meyer*, 2007 WL 2907276, at *10 (citing *Lexington Ins. v. Western Penn Hosp.*, 423 F.3d 318, 323 (3d Cir. 2005)).

defendants in *JJD Associates* had done.  Given this shortcoming and others, ambiguity exists.  We are bound to construe any such ambiguity in favor of the insured.  Here, the insured is Plaintiff.  Thus, summary judgement is granted insofar as the Court shall interpret the Policy's Vacancy Provision as the Plaintiff construes it.

## A.   Application of the Vacancy Provision

Now that we have determined that the Vacancy Provision is in reference to a unified building that is the sum of all the common areas, we move to the issue of whether the vacancy at Unit 205 triggered the Vacancy Provision.  In accordance with the Declaration of Condominium that created the Plaintiff Association, Plaintiff assumed the responsibility of maintaining all of the common elements of the Village Heights Condominium development.  (Doc. 16, ¶¶ 9-10).  In order to assist in the maintenance of these elements, Plaintiff employed Continental Real Estate Management ("Continental") beginning in 2005.  (*Id.*, ¶ 54).  An individual employed by Continental is stationed at the condominium development five days per week, performing general maintenance tasks.  (*Id.*, ¶ 55).  There is also a maintenance person on-call around the clock to respond to emergency maintenance issues that might arise.  (*Id.*, ¶ 56).  The parties agree that no individual representing Plaintiff inspected or performed maintenance on Unit 205 in the sixty (60) day period preceding the loss; however, the parties also agree that Plaintiff

continued to perform its management of the other condominiums' common areas throughout that time.  Indeed, Defendant makes no attempt to argue that less than 31% of the condominium development's common areas were in use by Plaintiff during the time preceding the loss.  As such, the common areas cannot be construed as vacant under the Policy's Vacancy Provision.

## IV.  CONCLUSION

In accordance with the analysis provided above, the Court finds that the Policy's language is ambiguous insofar as it is unclear whether Defendant meant to provide blanket building coverage to the structures in the Village Heights development as a unified building that is the sum of all the common areas, or whether the blanket coverage was meant to describe the coverage afforded to each separate structure as its own "building."  Accordingly, we construe the Policy in favor of the insured, Plaintiff, and read it in conformity with the former interpretation.  Because more than 31% of the development's common areas were in use at the time the loss occurred, we find that as a matter of law the Policy's Vacancy Provision does not apply.  Accordingly, summary judgment for the Plaintiff is granted.  A separate order shall issue in accordance with this ruling.

# THE CINCINNATI INSURANCE COMPANY

### A Stock Insurance Company

## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

Attached to and forming part of POLICY NUMBER:   ECP 025 06 21

Named Insured is the same as it appears on the Common Policy Declarations unless otherwise stated here.

| Loc. | (address) |
|------|-----------|
| | PER STATEMENT OF VALUES ON FILE |
| | REFER TO IA904 |

**COVERAGE PROVIDED**

**OPTIONAL COVERAGES**
Applicable only when an entry is made

| Item | Coverage | Limits | Coin-surance | Covered Cause Of Loss | Inflation Guard (%) | Replace-ment Cost (x) | Replace-ment Cost Ind. Stock (x) | Agreed Value (x) | Monthly Limit (fraction) | Maximum Period (X) | Extended Period (Days) |
|------|----------|--------|--------------|-----------------------|------|------|------|------|------|------|------|
| | BLANKET BUILDING | 15,282,755 | 100% | SPECIAL EQ | 2% | X | | | | | |
| | BLANKET BUSINESS PERSONAL PROPERTY | 265,000 | 100% | SPECIAL EQ | | | X | | | | |
| 1 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | | SPECIAL | | | | | | | |
| 2 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | | SPECIAL | | | | | | | |
| 3 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | | SPECIAL | | | | | | | |
| 4 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | | SPECIAL | | | | | | | |
| 5 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | | SPECIAL | | | | | | | |
| 6 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | | SPECIAL | | | | | | | |
| 7 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | | SPECIAL | | | | | | | |
| 8 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | | SPECIAL | | | | | | | |
| 9 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | | SPECIAL | | | | | | | |
| 10 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | | SPECIAL | | | | | | | |

| 11 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | SPECIAL |
| 12 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | SPECIAL |
| 13 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | SPECIAL |
| 14 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | SPECIAL |
| 15 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | SPECIAL |
| 16 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | SPECIAL |
| 17 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | SPECIAL |
| 18 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | SPECIAL |
| 19 | BUSINESS INCOME W/EXTRA EXPENSE (a) | 12 MONTHS ALS | SPECIAL |

DEDUCTIBLE: $500.00 unless otherwise stated $   5,000
EARTHQUAKE DEDUCTIBLE: 5%

MORTGAGE HOLDER

| Item | Name and Address |
|------|------------------|
| 1-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 2-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 3-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 4-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 5-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 6-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 7-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 8-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 9-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 10-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 11-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 12-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 13-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 14-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 15-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 16-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 17-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 18-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |
| 19-1 | KEYSTONE FINANCIAL BANK NA<br>PO BOX 3187<br>WILLIAMSPORT, PA 17701-0187 |

FORMS AND / OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:

FM101    04/04 BUILDING AND PERSONAL PROPERTY COVERAGE FORM (INCLUDING SPECIAL CAUSES OF LOSS)

FORMS AND / OR ENDORSEMENTS APPLICABLE TO THIS COVERAGE PART:

| | | |
|---|---|---|
| FCP407 | 11/13 | CINCIPLUS® CINCIPAK™ PROPERTY POWER XC+® (EXPANDED COVERAGE PLUS) ENDORSEMENT SUMMARY OF COVERAGE LIMITS |
| FCP201 | 01/11 | CINCIPAK™ COMMERCIAL PROPERTY AMENDATORY ENDORSEMENT |
| FCP202 | 01/11 | CINCIPAK™ BUSINESS INCOME (AND EXTRA EXPENSE) AMENDATORY ENDORSEMENT |
| FCP203 | 01/11 | CINCIPAK™ ACTUAL LOSS SUSTAINED BUSINESS INCOME ENDORSEMENT |
| FCP208 | 01/11 | CINCIPAK™ CONDOMINIUM ASSOCIATION PROPERTY COVERAGE ENHANCEMENT |
| FCP215 | 03/11 | CINCIPLUS® CINCIPAK™ PROPERTY POWER XC+® (EXPANDED COVERAGE PLUS) ENDORSEMENT |
| FA4013PA | 11/02 | PENNSYLVANIA CHANGES - ACTUAL CASH VALUE |
| FA4028PA | 11/05 | PENNSYLVANIA CHANGES |
| FA4042 | 11/07 | PROPERTY COVERAGE PART AMENDATORY ENDORSEMENT |
| FA450 | 11/04 | COMMERCIAL PROPERTY CONDITIONS |
| FA244 | 05/11 | EQUIPMENT BREAKDOWN COVERAGE (EXCLUDING PRODUCTION MACHINERY) |
| FA213 | 04/04 | BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM |
| FA240 | 04/04 | EARTHQUAKE AND VOLCANIC ERUPTION ENDORSEMENT |

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# SCHEDULE OF LOCATIONS

| LOC. | STREET ADDRESS | CITY | STATE | ZIP CODE |
|------|----------------|------|-------|----------|
| 1 | 305 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7690 | | | |
| 2 | 301 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7689 | | | |
| 3 | 265 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 4 | 257 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 5 | 249 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 6 | 243 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 7 | 237 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 8 | 231 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 9 | 227 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 10 | 219 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 11 | 205 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 12 | 250 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 13 | 240 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 14 | 220 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7688 | | | |
| 15 | 347 VILLAGE HEIGHTS DR<br>STATE COLLEGE, PA 16801-7689 | | | |

IA 904 04 04

# THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# SCHEDULE OF LOCATIONS

| LOC. | STREET ADDRESS | CITY | STATE | ZIP CODE |
|------|----------------|------|-------|----------|
| 16 | 361-363 VILLAGE HEIGHTS DR STATE COLLEGE, PA 16801-7689 | | | |
| 17 | 381 VILLAGE HEIGHTS DR STATE COLLEGE, PA 16801-7689 | | | |
| 18 | 300 VILLAGE HEIGHTS DR STATE COLLEGE, PA 16801-7689 | | | |
| 19 | 352-356 VILLAGE HEIGHTS DR STATE COLLEGE, PA 16801-7689 | | | |

IA 904 04 04